867 F.2d 1080
 131 L.R.R.M. (BNA) 2625, 110 Lab.Cas. P 10,928
 Robert F. DEFORD, on behalf of himself and all employees of
Soo Line Railroad Company affected by the disposition of
Lake States Transportation Division and Railway Labor
Executives' Association, on behalf of itself and represented
employees, Appellants,
v.
SOO LINE RAILROAD COMPANY, a Minnesota corporation, Soo Line
Corporation, a Minnesota corporation, Dennis M. Cavanaugh,
Wisconsin Central Ltd., an Illinois corporation, Edward A.
Burkhardt, Thomas Power, Robert H. Wheeler, John Doe and
Richard B. Oglivie, Appellees.
 No. 87-5376.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 12, 1988.
Decided Feb. 9, 1989.
 
 Timothy D. Kelly, Minneapolis, Minn., for appellants.
 Thomas P. Kane, St. Paul, Minn., for Wisconsin Cent. Ltd.
 Barry McGrath, Minneapolis, Minn., for Soo Line RR.
 Before LAY, Chief Judge, and HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 This appeal is brought by Robert F. Deford, on behalf of himself and all other employees of the Soo Line Railroad Company adversely affected by the sale of a portion of Soo Line's rail lines, and by the Railway Labor Executives' Association (RLEA).[1] The district court[2] denied a motion to remand the case to state court and dismissed appellants' complaint under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. The district court, in statements from the bench, determined that the case was a "minor dispute" under the Railway Labor Act (RLA), 45 U.S.C. Secs. 151-188 (1982), and that the RLA completely preempted Deford's state law claims of fraud, conspiracy, and tortious interference with creditor's rights, and required arbitration rather than court adjudication. We affirm the district court's judgment denying remand to state court and dismissing the complaint, and conclude that the district court properly analyzed the preemptive effects of the RLA. We further hold that under the circumstances of this case the Interstate Commerce Act (ICA), 49 U.S.C. Secs. 10101-11917 (1982), is also an appropriate basis to preempt the state law claims.
 
 I.
 
 2
 On April 2, 1987, Soo Line, a class I railroad with approximately 7,750 miles of rail lines in twelve states, agreed to sell a portion of its rail lines (1,960 miles) known as the Lake States Division to Wisconsin Central Ltd. Wisconsin Central, a recently formed Illinois corporation, was not a carrier prior to the transaction, but became a completely independent railroad upon the sale of the Lake States Division. The structure of the sale was a leveraged buyout, where Wisconsin Central, having little equity in the investment, financed a substantial portion of the purchase price. Wisconsin Central's lender then took a first lien on all the assets of the Lake States Division.
 
 
 3
 Sales such as these are governed by the Interstate Commerce Act (ICA), which provides for Interstate Commerce Commission (ICC) regulation of railroad acquisitions. To comply with the ICA, Wisconsin Central was required to either obtain ICC approval of the sale or receive an exemption from the ICC approval procedures. Wisconsin Central filed a notice of exemption with the ICC on September 4, 1987. The ICC stayed the effectiveness of the notice of exemption through October 27, 1987 to investigate the acquisition and invited comments by interested parties. After evaluating comments by several labor organizations, including the RLEA, the ICC lifted the stay but continued to review the transaction. The sale became effective three days later. The RLEA then filed a petition to revoke the exemption, which the ICC denied on July 8, 1988.
 
 
 4
 Deford and RLEA brought this action in Minnesota state court on June 12, 1987, asserting claims under Minnesota common law and the Minnesota Uniform Fraudulent Transfer Act, Minn.Stat.Ann. Secs. 513.41-51.[3] Deford first alleged that the sale of the Lake States Division to Wisconsin Central was an attempt to defraud Soo Line employees and the RLEA of their rights and benefits as creditors, in the form of accrued but unpaid wages, vacation pay, labor protection pay, insurance premiums, and pension contributions. Deford further alleged that the transfer of proceeds from the sale was not for fair consideration, leaving Soo Line with an unreasonably small amount of capital for future operations. Further, Deford stated that the sale proceeds will be disbursed to shareholders and other creditors of Soo Line, not to Soo Line employees. Thus, the position of the plaintiffs as creditors of an undercapitalized post-sale entity would be severely impaired. Deford also alleged that the leveraged sale of Lake States Division is a fraudulent conveyance as to those Soo Line employees who will quit and join Wisconsin Central, because Wisconsin Central's secured lenders will have superior claims to Lake States assets. Finally, Deford alleged common law claims of conspiracy to frustrate creditors' rights and tortious interference with creditors' rights, arguing that the purpose and effect of the transaction was to circumvent Soo Line's labor agreement obligations to its employees and union creditors.
 
 
 5
 Deford sought a declaration that the sale of the Lakes States Division, the distribution of proceeds from the sale, and the creation of any security interests on the assets of the Lake States Division constituted a fraudulent conveyance. Deford further sought an order that the proceeds from the sale not be disbursed or pledged until the rights of the plaintiffs are adequately provided for, and that a receiver be appointed so that the sale proceeds may be placed in trust for the benefit of Soo Line employees and creditors.
 
 
 6
 Thereafter, the suit was removed to the United States District Court of Minnesota on the grounds that federal law preempted the state claims. Upon Deford's motion to remand and Soo Line's motion to dismiss, the district court concluded:
 
 
 7
 plaintiffs have asserted rights arising under certain collective bargaining agreements and their contractual arrangements with the Defendant. * * * [T]hese claims are governed by the Railway Labor Act. * * * The application of this statute and the necessity of its interpretation establish the existence of a federal question as an essential element of the plaintiff's cause of action providing the basis for removal.
 
 
 8
 Deford v. Soo Line R.R. Co., No. 4-87-582, (D.Minn. August 20, 1987). The district court further stated that Deford could not avoid removal by failing to plead necessary federal questions and that artful pleading by the plaintiffs would not conceal the true nature of the complaint. Finally, the district court held that the case involved a "minor dispute" which must be arbitrated according to the procedures of the RLA, which provides that the exclusive forum for a union dispute is the National Railway Arbitration Board (NRAB). The district court concluded that since the state court lacked subject matter jurisdiction, the district court acquired none upon removal. The suit was therefore dismissed for lack of subject matter jurisdiction. Deford now appeals, alleging error in the removal of the case to federal court and the subsequent dismissal of the case.
 
 II.
 
 9
 The nature of the claims asserted by Deford have in essence two purposes. The first is to protect the rights and benefits of employees and the second is to raise questions about the financial soundness of the conveyance of the rail line from Soo Line to Wisconsin Central. These purposes in turn involve consideration of the protections afforded the employees by the Railway Labor Act, and the regulatory structures involved in approval of the transfer under the Interstate Commerce Act.
 
 
 10
 The primary issue before us is whether removal of Deford's state fraudulent conveyance and common law claims to federal court was proper, giving the district court power to dismiss for lack of subject matter jurisdiction. To determine this, we must decide whether the Railway Labor Act, the Interstate Commerce Act, or both completely preempt the state law claims. Only if there is complete preemption is removal justified, and it follows that such preemption then dictates dismissal.
 
 
 11
 To remove a case to federal court under 28 U.S.C. Sec. 1441, the claim must "aris[e] under" federal law. Ordinarily, a "right created by federal law must be an essential element of plaintiff's cause of action," and the essence of the federal claim must appear on the face of the complaint. Evans v. Missouri Pac. R.R. Co., 795 F.2d 57, 58 (8th Cir.1986), cert. denied, 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987). Thus, a defense of federal law, including the defense of federal preemption, is traditionally not a basis for removal. Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 4, 103 S.Ct. 2841, 2843, 77 L.Ed.2d 420 (1983).
 
 
 12
 The Supreme Court, however, has fashioned a significant exception to the general rule known as the "complete preemption doctrine." This rule states that when the preemptive force of a federal statute is "extraordinary," it "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Caterpillar, Inc. v. Williams, 482 U.S. 386, 107 S.Ct. 2425, 2430, 96 L.Ed.2d 318 (1987). This exception prohibits a plaintiff from defeating removal by failing to plead necessary federal questions in a complaint and allows a defense of federal preemption as a basis for removal.
 
 
 13
 The Supreme Court has specifically recognized the complete preemption doctrine in two distinct areas. In Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), the Supreme Court held that section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. Sec. 185, displaced any otherwise applicable state law, even though the suit was brought in a state court. Avco involved an employer who, relying on state law, brought suit in a state court to enjoin a union from violating a collective bargaining agreement by striking. The court stated that when a section 301 action is brought, "[s]tate law * * * will be absorbed as federal law and will not be an independent course of private rights." Id. at 560, 88 S.Ct. at 1237 (citing Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)). Thus, the claim was one arising under the laws of the United States within the meaning of the removal statute. 28 U.S.C. Sec. 1441(b).
 
 
 14
 The Supreme Court extended the complete preemption doctrine in Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), permitting removal based on claims arising under section 502(a) of the Employee Retirement Income Security Act (ERISA), which provides for exclusive federal resolution of employee benefit disputes involving a covered plan. The court stated that the remedies of the federal "scheme would be completely undermined if ERISA plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." 107 S.Ct. at 1547 (citing Franchise Tax Board, 463 U.S. at 25-26, 103 S.Ct. at 2854-55)).
 
 
 15
 Deford maintains that the complete preemption doctrine applies only to section 502(a) of ERISA and section 301 of LMRA and that the district court erred in finding that complete preemption applies to the RLA as well. We recognize the Supreme Court has expressed reluctance to find this extraordinary preemptive power. Id. We are satisfied, however, that the reasons underlying Caterpillar, Avco, and Metropolitan do not limit the doctrine to only the two statutes recognized by the Supreme Court. We believe that the fundamental question is whether the RLA or the ICA so pervasively occupy the field of railroad governance that a competing state law claim necessarily invokes federal law.
 
 III.
 
 16
 In analyzing the statutory scheme of the RLA, we conclude that it "pervasively occupies" the field of railroad labor disputes, completely preempting state law claims arising out of collective bargaining agreements. The Railway Labor Act was enacted by Congress to promote stability in labor-management relations in the railroad industry. Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978). To effectuate this purpose the RLA provides for mandatory administrative grievance procedures and remedies for "minor disputes" arising from the employment relationship between a railroad employee and the carrier.[4] A minor dispute is one involving the interpretation or application of an existing collective bargaining agreement. The RLA grants to the NRAB exclusive power to resolve all minor "disputes between an employee or group of employees and a carrier * * * growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * *." 45 U.S.C. Sec. 153(1)(i). NRAB decisions in disputes arising out of collective bargaining agreements are subject to limited judicial review in the federal courts. Once the administrative remedy with the NRAB has been exhausted, the party may not relitigate the issue in an independent judicial proceeding. Andrews v. Louisville & Nashville R.R. Co., 406 U.S. 320, 325, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95 (1972).
 
 
 17
 In compliance with the RLA requirements, federal courts have routinely dismissed a wide variety of state law claims, holding that statutory grievance procedures under the RLA are the mandatory and exclusive federal remedy for resolving minor disputes. "In enacting this legislation * * * Congress considered it essential to keep these so-called 'minor disputes' within the National Railroad Adjustment Board and out of the courts." Union Pacific R.R. v. Sheehan, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (emphasis added). See also Andrews, 406 U.S. at 325, 92 S.Ct. at 1565; Brotherhood of Locomotive Eng'rs v. Louisville & Nashville R.R. Co., 373 U.S. 33, 38, 83 S.Ct. 1059, 1062, 10 L.Ed.2d 172 (1963); Landfried v. Terminal R. Assoc., 721 F.2d 254, 255 (8th Cir.1983), cert. denied, 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984); Gregory v. Burlington N.R.R. Co., 638 F.Supp. 538, 540-41 (D.Minn.1986), aff'd, 822 F.2d 1092 (8th Cir.1987).
 
 
 18
 There is overwhelming case law to support our decision that the RLA's preemptive force is so extraordinary that it takes over the whole field of railroad labor disputes arising from collective bargaining agreements. In Andrews, 406 U.S. at 321, 92 S.Ct. at 1563, the Supreme Court accepted the RLA as an appropriate jurisdictional basis for removing a case from state to federal court. Similarly, the Ninth Circuit in Schroeder v. Trans World Airlines, Inc., 702 F.2d 189, 192 (9th Cir.1983), held that a state action against an employer for wrongful demotion was removable to federal court because the nature of plaintiff's complaint was actually a grievance or dispute under the RLA. See also Beers v. Southern Pac. Transp. Co., 703 F.2d 425, 427 (9th Cir.1983); McKinney v. Int'l Ass'n of Machinists & Aerospace Workers, 624 F.2d 745, 747 (6th Cir.1980). The Seventh Circuit has even equated the RLA with the LMRA to find complete preemptive powers in the RLA. See, e.g., Leu v. Norfolk & W. Ry. Co., 820 F.2d 825, 830 (7th Cir.1987); Graf v. Elgin, Joliet & E. Ry. Co., 790 F.2d 1341, 1346 (7th Cir.1986). Because section 153 of the RLA has essentially the same function as section 301 of the LMRA, which also involves settling collective bargaining disputes, these courts concluded that the Supreme Court's section 301 analysis in Avco, recognizing complete preemption of state law claims, should also apply to the RLA.
 
 
 19
 The Third Circuit, however, has recently addressed this issue and reached the opposite result. See Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R. Co., 858 F.2d 936 (3d Cir.1988) (hereafter P & LE ). In P & LE the RLEA asserted a fraudulent conveyance action against a railroad under a Pennsylvania statute similar to the Minnesota statute at issue here. The court held that the case was wrongfully removed to federal court because the complete preemption doctrine does not apply to collective bargaining disputes arising under the RLA. The P & LE court emphasized that because there is no affirmative indication of a congressional intention on the face of the statute to permit removal, the RLA cannot completely preempt state claims. In finding no congressional intent, the court particularly stressed the absence of a civil enforcement provision within the RLA under which the plaintiff could assert his fraudulent conveyance action. Because the plaintiff's state claim could not be recharacterized as a comparable claim arising under the RLA, no removal was permitted.
 
 
 20
 We believe that while the approach of the P & LE court sheds some light on whether a federal statute "pervasively occupies" a field of law, it is unnecessarily narrow. Not only must we look to affirmative congressional intent and civil enforcement provisions, but we must also look to such factors as the history and purpose of the statute. Recent case law illustrating the federal nature of the statute and analogous statutes with complete preemptive powers are also informative. Having analyzed the RLA under this light, we conclude that it was Congress' intent that the RLA govern all railway labor disputes such as those in this case arising from collective bargaining agreements.
 
 
 21
 Having decided that the complete preemption doctrine applies to collective bargaining disputes under the RLA, we must now decide whether Deford's Minnesota statutory and common law claims require interpretation of the collective bargaining agreement. Deford maintains on appeal that the common law and fraudulent conveyance claims alleged in his complaint do not fall within the definition of a "minor dispute" requiring the interpretation of a collective bargaining agreement. To determine if a claim is a minor dispute the key inquiry is "whether evaluation of the * * * claim is inextricably intertwined with consideration of the terms of the labor contract. If the state * * * law purports to define the meaning of the contract relationship, the law is preempted." Leu, 820 F.2d at 830 (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)).
 
 
 22
 Deford attempts to avoid RLA preemption by asserting that this action is not brought under any labor contract or protective agreement. The existence and extent of the creditor's rights asserted by Deford and the RLEA, however, can be determined only by interpreting the collective bargaining agreements. Even on the face of the complaint Deford predicates his claims upon entitlements to accrued but unpaid wages, vacation pay, life and health insurance, pension contributions, and severance benefits arising "pursuant to continuing labor contracts and employee protection agreements." Similarly, RLEA alleges entitlements "pursuant to the various collective bargaining agreements." In fact, all of plaintiffs' allegations regarding "creditors' rights" and "creditor obligations" are based entirely upon supposed rights to unspecified and unquantified "wages, benefits and labor protection" pursuant to the labor agreements. Deford and RLEA further assert as a basis for relief that "[e]mployees who quit would waive their rights under the Labor Agreements." Indeed, a theme that runs throughout the complaint is the defendants' alleged "circumvention of the burden of the Labor Agreements for Lake States' employees" through the sale.
 
 
 23
 Moreover, RLEA has sued Soo Line and Wisconsin Central in a separate action in federal district court in Chicago specifically alleging that the transaction here affects the rates of pay, rules and working conditions under various collective bargaining agreements between Soo Line and the unions. In its complaint, the RLEA sought to require compliance with the RLA and to arbitrate under the labor conditions set forth in New York Dock Ry.--Control--Brooklyn E.D. Terminal, 360 I.C.D. 60 (1979), which are imposed by the ICC. See Complaint, Counts III and IV and prayers for relief in Railway Labor Exec. Ass'n v. Soo Line R.R. Co., Civ. No. 87 C 52293 (N.D.Ill. filed July 13, 1987). We may take judicial notice of the pleadings filed in this proceeding. Fed.R.Evid. 201. RLEA ignores these allegations here when it maintains that no terms of collective bargaining agreements are at issue.
 
 
 24
 Deford further tries to avoid removal by arguing that the Minnesota fraudulent transfer act "imposes duties and obligations on all creditors completely independent of any collective bargaining agreement." This statement, however, mischaracterizes the nature of the fraudulent conveyance statute. The Minnesota Uniform Fraudulent Transfer Act is not substantive in nature, but instead merely confers an alternate remedy for protecting preexisting creditor rights. The creditor rights a party seeks to enforce must exist under independent law, such as contract law. See Brill v. W.B. Foshay Co., 65 F.2d 420, 423 (8th Cir.), cert. denied, 290 U.S. 643, 54 S.Ct. 61, 78 L.Ed. 558 (1933) (interpreting the Minnesota Fraudulent Transfer Act). The purpose of the statute is to grant creditors additional enforcement possibilities when a debtor transfers his assets to a third party. In this case the creditors rights asserted are based upon the terms of the collective bargaining agreements and the Minnesota statute only provides an additional method for enforcing the terms of the agreements. We therefore affirm the district court's finding that Deford's claims directly involve the collective bargaining agreements and constitute "minor disputes" under the RLA.
 
 
 25
 Deford bases his argument against preemption on Evans v. Missouri Pac. R.R. Co., 795 F.2d 57, 58 (8th Cir.1986), where we held that the federal preemption defense in response to a state law claim is not a ground for removal. Deford's reliance on Evans is misplaced. At dispute in Evans was whether a complaint alleging slander and damages pursuant to the Federal Employer's Liability Act was a "minor dispute" arising under the RLA. The Evans court found that the complaint presented no questions which would require interpretation of a collective bargaining agreement for their resolution and was therefore not a minor dispute. Id. The holding of Evans in no way excludes the RLA from the complete preemption doctrine.
 
 
 26
 Deford finally relies on several other Supreme Court cases to support his argument against removal of his claims under the RLA. These cases, however, can be distinguished from the present facts. In Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 198, 98 S.Ct. 1745, 1758, 56 L.Ed.2d 209 (1978), a suit seeking an injunction against a union's peaceful picketing on the ground that the picketing violated state trespass law was not preempted by the NLRA. The Supreme Court specifically determined, however, that the state trespass claim was completely unrelated to a collective bargaining agreement. In Lingle v. Norge Div. of Magic Chef, Inc., --- U.S. ----, 108 S.Ct. 1877, 1878, 100 L.Ed.2d 410 (1988), the Court held that section 301 of the LMRA did not completely preempt a state retaliatory discharge claim. The Court stated that a retaliatory discharge claim is a substantive state claim, "which addresses purely factual questions pertaining to the conduct of the employee and the conduct and motivation of the employer." Id. 108 S.Ct. at 1881. Neither of these elements require a court to interpret the terms of a collective bargaining agreement. Thus, preemption was not warranted. The creditors rights asserted by Deford, by contrast, directly involve the interpretation of collective bargaining agreements. Finally, in Farmer v. United Brotherhood of Carpenters and Joiners of America, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Supreme Court held that the NLRA did not preempt a state tort action for intentional infliction of emotional distress arising in connection with alleged employment discrimination. The Court, however, determined that the claim was not preempted because it was based on abusive and outrageous action by the defendant. Id. at 302, 97 S.Ct. at 1064. In this case there has been no pleading of conduct in the transaction that reaches the level of abusive or outrageous behavior found in Farmer. We therefore find Deford's arguments based on these Supreme Court cases unpersuasive.
 
 
 27
 In conclusion, Deford is essentially claiming that if the sale of rail lines from Soo Line to Wisconsin Central is not, in effect, unwound, the transaction will result in a breach of Soo Line's obligations under the existing collective bargaining agreements. Thus, by asserting state law claims, Deford seeks enforcement of the terms of the collective bargaining agreements. The fraudulent conveyance act serves only as an enforcement mechanism. We believe Deford is only trying to invoke a state law remedy in place of the mandatory and exclusive remedies of the Railway Labor Act, and we therefore affirm the district court's removal of the suit to federal court and its subsequent dismissal of the case.
 
 IV.
 
 28
 Additionally, we believe that the Interstate Commerce Act, 49 U.S.C. Secs. 10101-11917 (1982), so pervasively occupies the field of railroad governance that it completely preempts Deford's state law claims. As stated in the previous RLA analysis, we must focus on the nature and purpose of the ICA, illustrated by the language of the statute and recent case law, to determine if the complete preemption doctrine applies to the ICA. The ICA's primary purposes are to ensure fair shipping rates, safety, fair wages and working conditions, and efficiency in transportation, and to discourage monopolistic practices and labor strikes. See 49 U.S.C. Secs. 10101, 10101a. To promote these goals, the ICA generally requires that before a railroad acquires or abandons a railway line, the rail carriers involved must obtain approval by the ICC, which may include the imposition of labor protective agreements on the railroad. 49 U.S.C. Sec. 10901. Pursuant to section 10505, however, the ICC may exempt any transaction from regulation under section 10901 when it finds that regulation "is not necessary to carry out" national rail transportation policy, and is "not needed to protect shippers from the abuse of market power." 49 U.S.C. Sec. 10505(a). In 1985, the ICC exempted the entire class of transactions involving acquisition by "new carriers from the detailed approval procedures under section 10901."[5] See 49 U.S.C. Sec. 10505; Ex Parte No. 392, (Sub. No. 1), Class Exemption for the Acquisition and Operation of Rail Lines under 29 U.S.C. Sec. 10901, 1 I.C.2d 810 (1986), review denied sub nom. Illinois Commerce Comm'n v. ICC, 817 F.2d 145 (D.C.Cir.1987) (Ex Parte No. 392 ). Obviously labor protective agreements cannot be imposed when the transaction is exempt. The class exemption becomes effective and the transaction is deemed approved seven days after the acquiring entity files a verified notice with the ICC, unless the ICC stays the transaction.
 
 
 29
 Here Wisconsin Central filed a notice of exemption which was stayed by the ICC. After evaluating comments by the RLEA and other interested parties, the ICC lifted the stay, but continued to review the transaction. After bringing this action in federal court, the RLEA filed a petition to revoke the exemption and impose labor protective conditions, which the ICC denied.
 
 
 30
 The broad grant of power given the ICC in governing railway transactions is illustrated on the face of the ICA. The exclusivity of the ICC's authority is expressly set out in section 10501(d) which states: "The jurisdiction of the Commission ... over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules and practices of such carriers, is exclusive." In sections 1144, 1145, and 1166, Congress granted to the ICC the power to require extensive informational reports from rail carriers, including detailed financial data. The ICC in turn promulgated detailed regulations directing railroads to submit comprehensive financial and other operating data. 49 C.F.R. Part 1201. In determining whether to approve a transaction, the ICC is directed to consider both the financial aspects of the sale of rail lines to the non-carrier and the impact of the sale upon all employees involved. See 49 U.S.C. Secs. 10901(a), (e). Furthermore, the ICC has discretion to condition its approval of a section 10901 transaction on the imposition of labor protective agreements containing a "fair and equitable arrangement for the protection of the interests of railroad employees adversely affected by the transaction." 49 U.S.C. Sec. 10901(e). Thus, the ICC has obtained extensive information concerning the sale of Lake States Division and is uniquely qualified to evaluate the claims that Deford and the RLEA have brought before it. To allow Deford to now bring a state law action would be to disregard the ICC's authority and expertise in this matter.
 
 
 31
 Our decision is supported by the Supreme Court in Chicago N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). In Kalo Brick, the Court considered the extent of preemption of state law under former section 1(18) of the ICA, the predecessor of section 10901, in the context of a railroad abandonment. The plaintiff in Kalo Brick sought to collect damages in connection with the resulting loss of railroad services. In finding that the ICA preempted the state law claims, the Court reasoned that when Congress has chosen to legislate pursuant to its constitutional powers, a court must find state law preempted by federal regulation when the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. at 317, 101 S.Ct. at 1130 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). The Court further stated that the ICA "is among the most pervasive and comprehensive of federal regulatory schemes" and that "compliance with the intent of Congress cannot be avoided by mere artful pleading" of state law claims "to gain * * * the relief * * * denied by the Commission." Id. 450 U.S. at 318, 324, 101 S.Ct. at 1130, 1133. Also, the Court emphasized the exclusive nature of the ICC's jurisdiction and stated that "[t]he breadth of the Commission's statutory discretion suggests a congressional intent to limit judicial interferences with the agency's work." Id. at 321, 101 S.Ct. at 1132. Thus, it would be contrary to both the letter and the spirit of Kalo Brick to allow Deford and the RLEA to avoid the ICC's approval of the transaction pursuant to Ex Parte No. 392 by pleading a state law claim.
 
 
 32
 Deford relies on Hayfield N.R.R. Co. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984), which denies preemption by the ICA of state law claims. In this case, however, the railroad received ICC approval to abandon railway lines. Thereafter, another railroad initiated state condemnation proceedings. The Supreme Court held that the ICA did not preempt the state condemnation claims because the ICC relinquished jurisdiction upon granting abandonment, and the application of the state statute would not obstruct the accomplishment of the ICA. Id. at 634-35, 104 S.Ct. at 2617-18. Here, on the other hand, Deford and the RLEA seek to regulate, through state law, the same aspects of the same transaction that the ICC is evaluating. In addition, this matter does not involve an abandonment, which puts the subject property outside the scope of ICC regulation, but rather an acquisition of rail lines which brings the new carrier, Wisconsin Central, within the ambit of continued regulation under the ICA.[6] Consequently, the ICC provides a forum in which Deford may seek further relief, and reviews complaints or requests for revocation of the class exemption and imposition of labor protective conditions that might be submitted by Deford or the RLEA. The ICC stated in its order of October 8, 1987 authorizing the class exemption that it would continue to receive comments and to review the effects of the transaction. In its decision of July 8, 1988, the ICC analyzed the many comments it received, specifically addressing RLEA's petition to revoke the exemption, and upheld its decision to exempt the sale of Lake States Division.[7] The ICC stated, however, that although this was their final decision on the issue, it still had jurisdiction to scrutinize the transaction and subsequently to revoke the exemption and impose labor protective conditions if warranted. Finance Docket No. 31102, Wisconsin Central, Ltd.--Exemption Acquisition and Operation--Certain Lines of Soo Line Railroad Company, p. 12, served July 8, 1988.
 
 
 33
 Furthermore, the ICC has exclusive jurisdiction to approve the issuance of securities, including debt instruments, by a carrier. 49 U.S.C. Sec. 11301(b)(1). Here RLEA seeks to block Wisconsin Central's plan to finance its acquisition of the lines with debt instruments. The ICC, however, has exclusive jurisdiction over such an issuance and any disputes arising from it. Id. Thus, unlike Hayfield, the ICC will continue to review all complaints and to approve the issuance of securities. A state law action would therefore obstruct ICC functions.
 
 
 34
 In essence, we believe that this action is a collateral attack upon the ICC's decision to exempt the Lakes States Division sale from regulation. All of the claims brought by Deford and the RLEA in this lawsuit have been previously presented to the ICC for its consideration. When Wisconsin Central filed with the ICC a notice of exemption under Ex Parte No. 392, the ICC invited comments from any interested parties. The RLEA submitted extensive comments opposing approval of the transaction which focused on the financial aspects of the transaction--the same issues it raises under the guise of state fraudulent conveyance law in this lawsuit. In addition to RLEA's comments, the ICC entertained comments from other parties in considering its response to Wisconsin Central's petition for exemption. In its decision of October 8, 1987 the ICC lifted the stay of the exemption and allowed Wisconsin Central to acquire the Soo Line properties, but stated that it would continue to exercise its exclusive primary jurisdiction.
 
 
 35
 After Wisconsin Central consummated the purchase and began operating, the RLEA submitted a petition to revoke the exemption. In the petition, RLEA contended that because of the precarious financial position of Wisconsin Central due to the leveraged buyout, the ICC should exercise its discretion to revoke the exemption and impose employee protective conditions. On July 8, 1988, the ICC issued an order addressing these allegations. After a detailed analysis, the ICC concluded that Wisconsin Central's financial position was stable and that it would not revoke the exemption nor impose the employee protective conditions. RLEA's present attack on this transaction is no more than an attempt to annul or set aside the ICC's decisions with respect to this rail transaction under the exemption procedures. We therefore find it impossible to grant the relief Deford and the RLEA seeks here without impinging on the ICC's order. We conclude that when such a collateral attack is brought in state court under the guise of state law, the ICA necessarily completely preempts the state law claims and the suit is removable to federal court.
 
 
 36
 The Supreme Court reached the same result in Venner v. Michigan Central R.R., 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926). In Venner, the ICC, upon application by rail carriers, approved an agreement between three railroads to acquire locomotives and pay for them by issuing certificates. Plaintiff brought an action in state court to enjoin the issuance of certificates, which was later removed to federal court on defendant's motion. The federal court dismissed the appeal as a collateral attack on the ICC's order, holding the appeal to be:
 
 
 37
 essentially one to annul or set aside the order of the [ICC]. While the [complaint] does not expressly pray that the order be annulled or set aside, it does assail the validity of the order and pray that the defendant [companies] be enjoined from doing what the order specifically authorizes, which is equivalent to asking that the order be adjudged invalid and set aside.
 
 
 38
 Id. at 130, 46 S.Ct. at 445. This language aptly fits the efforts of Deford in this action. See also Railway Labor Exec. Ass'n v. Staten Island R.R., 792 F.2d 7, 12 (2d Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987) (district court dismissed claim alleging a violation under RLA because it impinged on ICC order under class exemption proceedings).
 
 
 39
 In sum, we believe that the ICA demonstrates Congress' intent to delegate to the ICC the exclusive responsibility to evaluate all aspects, including financial viability, of rail line transfers. The ICA provides both a forum and a set of remedies that is exclusive and completely preempts competing state law claims.
 
 V.
 
 40
 We have determined that both the RLA and the ICA preempt Deford's state law claims. In two recent cases, we held that when there is a conflict between the RLA and the ICA, the provisions of the ICA governing labor protection agreements supersede the mandatory bargaining requirements of the RLA. Burlington N.R.R. Co. v. United Transp. Union, 848 F.2d 856, 863 (8th Cir.1988); Railway Labor Executives' Ass'n v. Chicago & N.W. Transp. Co., 848 F.2d 102, 104 (8th Cir.1988).[8]
 
 
 41
 In this case, however, it is not necessary that we decide which of the two statutes governs to the exclusion of the other. We have found complete preemption from both and removal is justified if there is complete preemption from only one. Once the district court had jurisdiction, the complete preemption which conferred jurisdiction was sufficient to authorize dismissal on grounds of preemption. We affirm the judgment of the district court.
 
 
 42
 LAY, Chief Judge, dissenting.
 
 
 43
 I respectfully dissent. Neither the Railway Labor Act (RLA) nor the Interstate Commerce Act (ICA) justifies removal under the "complete preemption doctrine." The doctrine is a narrow one. It allows removal when the preemptive force of a statute is so "extraordinary" that it completely displaces an area of state law.
 
 
 44
 The Supreme Court has been careful to limit the situations in which removal is appropriate. The Court has applied the doctrine in cases involving section 301 of the LMRA, 29 U.S.C. Sec. 185(a), and section 502(a) of ERISA, 29 U.S.C. Sec. 1132. In Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 107 S.Ct. 1542, 1548, 95 L.Ed.2d 55 (1987), the Court examined the intent of Congress to determine whether section 502(a) of ERISA permitted removal. Justice Brennan, joined by Justice Marshall, concurred in the unanimous opinion of the Court, but wrote separately to emphasize the narrowness of the complete preemption doctrine:
 
 
 45
 [O]ur decision should not be interpreted as adopting a broad rule that any defense premised on congressional intent to preempt state law is sufficient to establish removal jurisdiction. The Court holds only that removal jurisdiction exists when, as here, "Congress has clearly manifested an intent to make causes of action ... removable to federal court." (emphasis added). In future cases involving other statutes, the prudent course for a federal court that does not find a clear congressional intent to create removal jurisdiction will be to remand the case to state court.
 
 
 46
 Id. 107 S.Ct. at 1548 (Brennan, J., concurring) (citation omitted) (emphasis in original).
 
 
 47
 No interpretation of the collective bargaining agreement is required here; therefore the RLA does not preempt state law. I would further hold under the circumstances presented here the ICA does not contain such extraordinary preemptive force as to invoke the complete preemption doctrine.
 
 The Railway Labor Act
 
 48
 The majority finds that the employees' state law claims exist only to the extent that the collective bargaining agreement with the railroad creates entitlement to payment. The majority also finds that the interpretation of the collective bargaining agreement must be submitted to arbitration as a minor dispute under the RLA. The majority thus concludes that removal was proper under the RLA and that there exists no jurisdiction over minor disputes. The Supreme Court recently addressed the error of these conclusions in Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. ----, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).
 
 
 49
 In Lingle, the Court held "that an application of state law is pre-empted by Sec. 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement." Id. 108 S.Ct. at 1885 (footnote omitted) (my emphasis).
 
 
 50
 The Court then described when "interpretation" is required:
 
 
 51
 A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state law suit is entitled. Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state law claim, not otherwise pre-empted, would stand. Thus, as a general proposition, a state law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state law analysis would not be thereby pre-empted.
 
 
 52
 Id. 108 S.Ct. at 1885 n. 12 (citation omitted). The Court recognized the state law claim even though plaintiff would have to rely upon federal law for the determination of a damage award. The Court did not find that the state law claims were preempted by section 301 of the NLRA, let alone the complete preemption necessary for removal jurisdiction.
 
 
 53
 Here, plaintiffs assert claims under Minnesota common law and the Minnesota Uniform Fraudulent Transfer Act, Minn.Stat.Ann. Secs. 513.41-51. As in Lingle, plaintiffs base their claims on definitive state law.
 
 
 54
 The majority finds that the Minnesota statute is not substantive, but that it seeks to enforce pre-existing creditor's rights which "exist under independent law, such as contract law." Supra at 1087. Interpretation of the collective bargaining agreement is required only to determine standing as a creditor, and to determine the amount of damages. The state statute creates an entitlement independent of the collective bargaining agreement, and is not preempted by the RLA.
 
 Interstate Commerce Act
 
 55
 The Interstate Commerce Act is not as pervasive in scope as either section 301 of the LMRA or section 502(a) of ERISA. Therefore, the ICA does not completely preempt state law.
 
 
 56
 The general jurisdictional section of the ICA is contained in 49 U.S.C. Sec. 10501. This section grants the Interstate Commerce Commission (ICC) jurisdiction over the "transportation" of people and property, and over related services. 49 U.S.C. Sec. 10102(26). However, these sections do not confer jurisdiction over the sale of existing rail lines. Other sections of the ICA contain more specific grants of jurisdiction.[1] 1] However, none of these sections is as pervasive in scope as are the two recognized areas of complete preemption set forth in Taylor and Lingle. The very structure and specificity of these sections tend to deny that the whole field of transportation has been extraordinarily preempted so as to justify removal jurisdiction.
 
 
 57
 In Hayfield N.R.R. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984), the Supreme Court considered whether federal regulation of abandonment of rail lines was so pervasive as to preclude state action. Id. at 632-34, 104 S.Ct. at 2616-18. The Court stated:
 
 
 58
 The first contention attempts to bring this case within the narrow ambit of decisions in which this Court has indicated that congressional legislation so occupied the field of a particular subject area that state regulation within that field would be improper no matter how well state law comported with the federal policies involved. This Court has repeatedly affirmed, however, that "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons--either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."
 
 
 59
 Id. at 632, 104 S.Ct. at 2616 (citations omitted). The Court considered four factors in finding no preemption. First, the Court found Congress had not "unmistakably ordained" that states may not exercise traditional power of eminent domain over railroad property. Second, nothing in the Act referred to federal preemption of disposition of abandoned lines. Third, there was no indication that the subject matter permitted "no other conclusion" than that it was governed by federal, not state regulation. Finally, state law traditionally "governs the condemnation of ordinary real property." Id. at 632, 104 S.Ct. at 2616. The Court also found that condemnation did not obstruct the objectives of section 10905. Id. at 634-36, 104 S.Ct. at 2617-19.
 
 
 60
 This case is analogous to Hayfield. In Hayfield, the Court focused on section 10905 instead of the general jurisdictional statute, section 10501. This supports the contention that not all railroad transactions are preempted by federal law. The jurisdictional section at issue in our case, section 10901, (jurisdiction for construction and operation and exemptions for certain sales under Ex Parte No. 392, 1 I.C.C.2d 810 (Dec. 19, 1985)) is nearly identical to section 10905. Section 10901(c)(1) is identical to section 10905(c) except that it expresses what the ICC "may" do instead of what it "shall" do. The use of the word "may" tends to make section 10901 weaker than section 10905. Finally, conveyances of real property and restrictions on corporate transactions are generally matters of state concern. In Hayfield, not only did the Supreme Court fail to hold the field to be so completely preempted as to create removal jurisdiction, but it did not even find state law eminent domain preempted by the federal abandonment provisions.
 
 
 61
 The majority relies primarily on Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). The Supreme Court held that the ICA "precludes a shipper from pressing a state-court action for damages against a regulated carrier when the [ICC], in approving the carrier's application for abandonment, reaches the merits of the matters the shipper seeks to raise in state court." Id. at 331-32, 101 S.Ct. at 1137. However, this case is distinguishable from the facts here because the ICC did not in fact reach the merits of the fraudulent conveyance claims. Although the ICC claims it has continuing jurisdiction to evaluate the exemption granted by it to permit the sale, the ICC is not required to examine the merits of plaintiffs' claims, and has not done so. See 49 U.S.C. Sec. 10901, Ex Parte No. 392, 1 I.C.C.2d 810 (Dec. 19, 1985).
 
 
 62
 In announcing its grant of class exemption permitting sale without compliance with the more rigorous requirements of section 10901, the ICC stated:
 
 
 63
 Finally, it should be noted that the use of the exemption process for approval of a transaction of this scope has raised some concern. We continue to believe that the policy underlying the exemption procedure established in Ex Parte No. 392 (Sub-No. 1) for the sales of lines to non-railroads remains valid and on the whole has been extremely beneficial to the shipping public. Nevertheless, it is true that the larger transactions, however one might define them, present issues which are at least somewhat less appropriately dealt with by the exemption process. More interests are more greatly affected, and the efficacy and fairness of revoking the exemption in a later proceeding becomes more questionable. Those difficulties are clearly raised with this transaction.
 
 
 64
 Wisconsin Central Ltd., Finance Docket No. 31102, Slip. op. at 3 (ICC Oct. 7, 1987). This indicates that the ICC has not reached the merits of plaintiffs' claims and that it still had some apprehension over its grant of a class exemption.
 
 
 65
 I would hold that any preemptive force of either the RLA or the ICA is not of the magnitude necessary to completely preempt state law so as to create removal jurisdiction. I would reverse the district court's decision and remand with orders that the case be remanded to state court.
 
 
 
 [1]
 RLEA is a voluntary, unincorporated association of the chief executive offices of the standard national and international railway unions in the United States. RLEA brings this action on behalf of its constituent members and their unions
 
 
 [2]
 The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota
 
 
 [3]
 Deford and RLEA framed their complaint around Minn.Stat. Secs. 513.20-513.32. This statute, however, was repealed but reinstated in 1987 with minor changes. Because the changes are not relevant here, we base our analysis on the new statute. The statute provides in part:
 
 
 [513]
 44. Transfers fraudulent as to present and future creditors
 (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
 (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
 (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
 (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
 (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.
 * * *
 
 
 [513]
 45. Transfers fraudulent as to present creditors
 (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
 * * *
 
 
 [4]
 "The terms 'major' and 'minor' are not contained in the RLA, but were articulated by the United States Supreme Court to differentiate two types of disputes described in the Act which have distinct avenues of relief." Brotherhood of Locomotive Eng'rs v. Boston & Maine Corp., 788 F.2d 794, 797 n. 3 (1st Cir.), cert. denied, 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986) (citing Elgin Joliet & E. Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)). Major disputes relate to the "formation or modification of the collective bargaining agreement," and thus have no bearing whatsoever on this case. The issue here is whether the minor dispute provisions of the RLA apply to preempt plaintiffs' state law causes of action
 
 
 [5]
 A "new carrier" is a newly formed railroad not already subject to the ICA
 
 
 [6]
 Kalo Brick is distinguished from Hayfield in that it involved a state law claim for damages arising from the ICC's approval of abandonment. In Hayfield, the suit concerned activities occurring after the ICC had approved the abandonment
 
 
 [7]
 The ICC's July 8, 1988 order limited further discovery and emphasized the restriction that would be placed upon it. It is also of interest that the order referred to the RLEA's purchase offer for Lake States Division
 
 
 [8]
 The Supreme Court has recently granted certiorari in Railway Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R., 845 F.2d 420 (3d Cir.1988), which involves issues of preemption between the ICA and RLA
 
 
 [1]
 For example, 49 U.S.C. Secs. 10901 (authorizing construction and operation of railroad lines), 10902 (authorizing action to provide adequate, efficient and safe facilities), 10903 (authorizing abandonment and discontinuance of railroad lines and rail transportation), 11301 (authority of certain carriers to issue securities and assume obligations and liabilities) and 11501 (ICC authority over interstate transportation) are such provisions