2003 DSD 12

State of SOUTH DAKOTA by and through its SOUTH DAKOTA RAILROAD AUTHORITY and Dakota Missouri Valley & Western Railroad, Inc., a North Dakota Corporation, Plaintiffs,

and

Dakota, Minnesota & Eastern Railroad Company, a Delaware Corporation, Involuntary Plaintiff,

v.

BURLINGTON NORTHERN & SANTA FE RAILWAY COMPANY, a Delaware Corporation, Defendant.

No. CIV 03–3012.

United States District Court,
D. South Dakota,
Central Division.

July 7, 2003.

Charles M. Thompson, May, Adam, Gerdes & Thompson, Pierre, SD, for Dakota Missouri Valley & Western Railroad, Inc.

Brian J. Donahoe, David Lindsay Edwards, Cutler & Donahoe, LLP, Sioux Falls, SD, for Dakota, Minnesota & Eastern Railroad Company.

Rory King, Bantz, Gosch, Cremer, Peterson, Sommers & Wager, Aberdeen, SD, for Defendants.

## ORDER

KORNMANN, District Judge.

### INTRODUCTION

[¶ 1] On March 20, 2003, the State of South Dakota, by and through the South Dakota Railroad Authority ("SDRA"), filed a complaint in South Dakota, Sixth Judicial Circuit, Hughes County, against the Burlington Northern & Santa Fe Railway Company ("BNSF"). The complaint seeks specific performance or injunctive relief enforcing the terms of a June 15, 2001, agreement between the SDRA and BNSF which allegedly allows the SDRA and its designees, the Dakota, Minnesota & Eastern Railroad Corporation ("the DM & E") and the Dakota, Missouri Valley & Western Railroad, Inc. ("the DMV&W"), the right to utilize BNSF's Aberdeen Interchange access line ("Aberdeen interchange") for rail traffic handled on the SDRA's own rail lines to the South and North of Aberdeen. The complaint also seeks damages for breach of contract and tortious interference with the business relationships (1) between the SDRA and the DM & E, (2) between the SDRA and the DMV & W, and (3) among various entities, including customers, regarding the transportation of goods on the SDRA's rail lines North through the Aberdeen interchange (subsequently accessing Canadian markets). Punitive damages are also sought.

Roxanne Giedd, Attorney General's Office, Pierre, SD, for State of South Dakota and South Dakota Railroad Authority.

[¶ 2] On March 31, 2003, the SDRA filed an amended complaint in state court wherein the DMV & W joined as a party plaintiff and the DM & E was named as an involuntary plaintiff pursuant to SDCL 15-6-19(a). The only possible basis for the SDRA filing an amended complaint naming the DM & E as an involuntary plaintiff, based upon SDCL 15-6-19(a), is to address a portion of the South Dakota rule: "If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff." Thus, it is obvious that the DM & E refused to be made a party after having been requested by the SDRA to be a party.

[¶ 3] There are serious procedural problems with actions taken by the SDRA. If a party to an already filed lawsuit, whether in state or federal court, wants to add or drop a party, this is not to be accomplished by simply amending the complaint, especially since early on this could be done without leave of court and it could be done any time by stipulation. If this were allowed by the Rules of Civil Procedure, one or more defendants or plaintiffs could be added at any time without leave of court, whether or not the statute of limitations had expired, whether or not a scheduled trial date would be impacted, whether or not venue was proper, and whether or not jurisdiction existed as to a proposed party. Obviously, the rules would never permit this. The proper procedure in state court is to make a motion under SDCL 15-6-21, a mirror of Fed.R.Civ.P. 21. These rules state, in part: ***"Parties may be dropped or added by order of the court on motion*** of any party or of its own initiative at any stage of the action and on such terms as are just." (emphasis supplied) The words "by order of the court" mean something. It is up to the court to make the decision based on what the rule clearly says. Certainly, a party can move to add a party under Rule 21 and, contingent upon such motion being granted, move for leave to serve and file the amended complaint. Pleadings and Motions are dealt with under Part III of the Rules. Parties are dealt with under Part IV of the Rules. If a plaintiff could simply add a party by amending the complaint, there would be no purpose for Rule 19 or its state equivalent.

[¶ 4] The amended complaint alleges that, in addition to the June 15, 2001, contract set forth above, BNSF was also breaching a contract with the DM & E executed on October 8, 1986, and contracts between the SDRA's and BNSF's predecessors executed on August 13, 1975, and July 10, 1977. The amended complaint again seeks specific performance or injunctive relief enforcing the terms of the various agreements (copies of which agreements are attached to the amended complaint) and also seeks damages for breach of contract and tortious interference with business relationships, as well as punitive damages. The SDRA first adds an involuntary plaintiff, DM & E, and then attempts to assert DM & E's rights under a contract to which the SDRA is not a party. This is a curious approach. The SDRA seeks to specifically enforce a contract to which it is not a party. The SDRA also seeks to recover damages from BNSF on a claim that BNSF breached a contract between the predecessor of BNSF and the predecessor of the DM & E. All of this is despite the fact that the DM & E, after having been asked to do so, obviously declined to become voluntarily involved in litigation.

[¶ 5] There is a related action pending in this court. On March 19, 2003, the BNSF (a Delaware corporation) filed a federal diversity action against the DMV & W (a North Dakota corporation) concerning trackage rights and the use of the Aberdeen interchange as set forth in the agree-

ments described above. *See* CIV 03–1003. That federal lawsuit was commenced on March 19, 2003. Fed.R.Civ.P. 3. In the amended complaint of that federal action, BNSF seeks a declaratory judgment that the 2001 and 1986 agreements do not grant the DMV & W the right to use the Aberdeen interchange for so-called bridge movement. BNSF's amended complaint also seeks damages, including punitive damages, for trespass and tortious interference with the 2001 agreement between BNSF and the SDRA and the 1986 agreement between BNSF and the DM & E. Finally, BNSF seeks preliminary and permanent injunctive relief preventing the DMV & W from unauthorized use of the Aberdeen interchange.

■■■ [¶ 6] To return to the case at hand, BNSF filed a notice of removal of the plaintiffs' state court lawsuit to federal court on April 8, 2003. Actions may be removed pursuant to 28 U.S.C. § 1441, *inter alia,* where the United States district courts have original jurisdiction over the action because the action is founded on a claim or right arising under the Constitution, treaties or law of the United States, or because there exists diversity of citizenship. BNSF contends that this court has original jurisdiction over the state court action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the plaintiffs' claims are preempted by federal law and because the "plaintiffs' claims are necessarily premised on and dependent on claims arising under the law of the United States."

[¶ 7] The SDRA, Doc. 3, and the DM & E, Doc. 7, filed so-called emergency motions to remand pursuant to 28 U.S.C. § 1447(c). The basis of the "emergency" was that a hearing on the plaintiffs' request for a preliminary injunction was, prior to removal, scheduled for April 17, 2003. That hearing was presumably cancelled when this matter was removed to federal court because, upon the filing of the notice of removal, the state court lost all jurisdiction. BNSF resists remand, claiming this matter is properly in federal court based upon the complete preemption of plaintiffs' state law claims.

**DECISION**

**I. PREEMPTION.**

■■■ [¶ 8] "The party opposing remand has the burden of establishing federal subject-matter jurisdiction." *Green v. Ameritrade, Inc.,* 279 F.3d 590, 596 (8th Cir.2002).

> Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant. Absent diversity of citizenship, federal-question jurisdiction is required. The presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.

*Magee v. Exxon Corp.,* 135 F.3d 599, 601 (8th Cir.1998) (quoting *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987)). It is well established that the "right created by federal law must be an essential element of plaintiff's cause of action, and that the centrality of this federal claim must appear on the face of the 'well-pleaded complaint,' unaided by the answer or petition for removal." *First National Bank of Aberdeen v. Aberdeen National Bank,* 627 F.2d 843, 848 n. 12 (8th Cir.1980).

■■■ [¶ 9] Plaintiffs' complaint does not, on its face, allege any claimed federal question for federal court jurisdiction. Plaintiffs have succeeded in at least temporarily defeating diversity jurisdiction by naming as an involuntary plaintiff a corpo-

ration which was organized under the laws of the state of Delaware, also the state of incorporation for BNSF. BNSF has made no claim that the non-diverse involuntary plaintiff (DM & E) was joined in the state court action to defeat diversity of citizenship. This is commonly called a "sham" or "fraudulent" joinder. The term "fraudulent" is not used to indicate any "bad motive" or improper conduct and there is no necessity to show that the joinder was for the purpose of preventing removal to federal court. One of the questions would be whether there is any possibility that the DM & E could establish liability against BNSF as a result of the dealings between BNSF and the SDRA. The court could, in an appropriate case, then disregard the joined non-diverse party and uphold the removal. Again, however, BNSF makes no such claim. Further, plaintiffs have pleaded only state law breach of contract and tort claims.

[¶ 10] BNSF contends that removal was proper because plaintiffs' state law claims are preempted by federal law. "Federal-question jurisdiction is not created by a federal defense, including the defense of preemption, even if the defense is the only contested issue in the case." *Magee v. Exxon Corp.*, 135 F.3d at 601. Neither BNSF's assertion of a preemption defense nor the fact of preemption of plaintiffs' state law claims would provide a basis for federal jurisdiction. *See First National Bank of Aberdeen v. Aberdeen National Bank*, 627 F.2d at 848 n. 12. State courts can and do decide questions of federal law, including questions of federal preemption. *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 486 n. 7, 119 S.Ct. 1430, 1438 n. 7, 143 L.Ed.2d 635 (1999).

[¶ 11] A narrow exception to the general "well-pleaded complaint rule," however, "is the doctrine of 'complete preemption,' under which the preemptive force of certain federal statutes is deemed so 'extraordinary' as to convert complaints purportedly based on the preempted state law into complaints stating federal claims from their inception." *Krispin v. May Dept. Stores Co.*, 218 F.3d 919, 922 (8th Cir.2000).

That said, the Supreme Court has recognized a corollary to the well-pleaded complaint rule known as the complete preemption doctrine. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 107 S.Ct. 2425, 2430, 96 L.Ed.2d 318 (1987). Under this doctrine, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.; see also Hurt v. Dow Chemical Co.*, 963 F.2d 1142, 1144 (8th Cir.1992) ("It is not just that a preemption defense is present: the [pleaded state-law] claim is completely federal from the beginning"). The complete preemption doctrine applies only when a federal statute possesses " 'extraordinary preemptive power,' a conclusion courts reach reluctantly." *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 543 (8th Cir.1996) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987)). Congressional intent is the touchstone of the complete preemption analysis. *See id.* at 544. We must determine whether Congress has clearly manifested an intent to make a cause of action pleaded under state law removable to federal court, *see Metropolitan Life*, 481 U.S. at 66, 107 S.Ct. at 1547–48, mindful that in the ordinary case federal preemption is merely a defense to a plaintiff's lawsuit, *see id.* at 63, 107 S.Ct. at 1546.

*Magee v. Exxon Corp.*, 135 F.3d at 601–602.

[¶ 12] Preemption traditionally comes in four "flavors" which the Eighth Circuit has characterized as follows:

(1) "express preemption," resulting from an express Congressional directive ousting state law (*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)); (2) "implied preemption," resulting from an inference that Congress intended to oust state law in order to achieve its objective (*Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)); (3) "conflict preemption," resulting from the operation of the Supremacy Clause when federal and state law actually conflict, even when Congress says nothing about it (*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963)); and (4) "field preemption," resulting from a determination that Congress intended to remove an entire area from state regulatory authority (*Fidelity Fed. Savs. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)).

*Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dept. of Commerce*, 999 F.2d 354, 358 n. 3 (8th Cir.1993). Congress may also delegate to a federal agency the ability to preempt state common law. *Symens v. Smithkline Beecham Corp.*, 152 F.3d 1050, 1053 (8th Cir.1998). Each of these "flavors" of preemption are concerned with the choice of law to be applied, state or federal, and not with the choice of forum. We are concerned here with whether at least some of the plaintiffs' claims are completely preempted so as to "arise under" federal law as required for removal jurisdiction under 28 U.S.C. § 1441, thereby allowing this matter to proceed in a federal forum.

[¶ 13] "The complete-preemption doctrine provides that a state-law claim becomes a federal question when Congress intends that a federal statute completely preempt the applicable field of law." *Green v. Ameritrade, Inc.*, 279 F.3d at 596.

Complete preemption provides an exception to the well-pleaded complaint rule and is different from preemption used only as a defense. Complete preemption can arise when Congress intends that a federal statute preempt a field of law so completely that state law claims are considered to be converted into federal causes of action. *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 65, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987); *Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). To be completely preemptive, a statute must have "extraordinary pre-emptive power," a conclusion courts reach reluctantly. *Metropolitan Life*, 481 U.S. at 65, 107 S.Ct. at 1547. The term "complete preemption" is somewhat misleading because even when it applies, all claims are not necessarily covered. Only those claims that fall within the preemptive scope of the particular statute, or treaty, are considered to make out federal questions, *see Metropolitan Life*, 481 U.S. at 64–66, 107 S.Ct. at 1546–48, but the presence of even one federal claim gives the defendant the right to remove the entire case to federal court. 28 U.S.C. § 1441. Complete preemption therefore has jurisdictional consequences that distinguish it from preemption asserted only as a defense. The defense of preemption can prevent a claim from proceeding, but in contrast to complete preemption it does not convert a state claim into a federal claim.

*Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 543 (8th Cir.1996).

The issue of whether complete preemption exists is separate from the issue of whether a private remedy is created under a federal statute. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 391 n. 4, 107 S.Ct. 2425, 2428–29 n. 4, 96 L.Ed.2d 318 (1987). Complete preemption can sometimes lead to dismissal of all claims in a case. Although courts may be reluctant to conclude that Congress intended plaintiffs to be left without recourse, *see M. Nahas & Co., Inc. v. First National Bank of Hot Springs,* 930 F.2d 608, 612 (8th Cir.1991), the intent of Congress is what controls. *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987) (citations omitted).

*Gaming Corp. of America v. Dorsey & Whitney,* 88 F.3d 536, at 547.

▮▮▮▮▮ [¶ 14] Where federal law is so powerful as to displace entirely any state cause of action for breach of contract or tort, any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of federal law. *Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for Southern Cal.,* 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983). In effect, complete preemption allows a state law complaint to be recharacterized as an action arising under federal law, justifying removal to federal court. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 64, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987).

[¶ 15] Complete preemption has been recognized in only a very limited number of circumstances. *See Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968) (section 301 of the Labor Management Relations Act ("LMRA")), and *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (section 502(a) of the Employee Retirement Income Security Act ("ERISA")). The United States Court of Appeals for the Eighth Circuit has recognized complete preemption in an increasing number of cases. *See Gaming Corporation of America v. Dorsey & Whitney,* 88 F.3d 536 (8th Cir.1996) ( Indian Gaming Regulatory Act completely preempts state laws regulating gaming on Indian lands). In addition, the Eighth Circuit has held that the Railway Labor Act ("RLA") " 'pervasively occupies' the field of railroad labor disputes, completely preempting state law claims arising out of collective bargaining agreements." *Deford v. Soo Line R. Co.,* 867 F.2d 1080, 1085 (8th Cir.1989). *Deford* also held that the Interstate Commerce Act ("ICA"), §§ 10101–11917, "so pervasively occupies the field of railroad governance that it completely preempts Deford's state law claims" alleging that the sale of a portion of Soo Line's rail lines to a newly formed carrier constituted a fraudulent conveyance designed to defeat the rights of Soo line employees as creditors. *Deford,* 867 F.2d at 1088.

[¶ 16] *Deford* relied upon the "broad grant of power given the ICC [Interstate Commerce Commission] in governing railway transactions" found at 49 U.S.C. § 10501(d) which provided that "[t]he jurisdiction of the Commission ... over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules and practices of such carriers is exclusive." *Id.* at 1088–89. *Deford* also relied upon the Supreme Court's decision in *Chicago and N.W. Transp. Co. v. Kalo Brick and Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (hereinafter *Kalo Brick* ), which held that the ICA preempts a state court action for damages for abandonment of a railway line when that abandonment was regulated by the ICC.

[¶ 17] Neither *Deford* nor *Kalo Brick* can be said to be completely on point in this case. Plaintiffs are not contending that the contractual rights arising out of ICC (now STB) approved railway contracts interfere in any way with the rights of employees. Nor are plaintiffs contending that those contracts should not have been approved in the first place. Nor are plaintiffs directly challenging carrier rates, extensions of service, or licensing, all areas the courts have said are preempted by the ICA. *See Kalo Brick,* 450 U.S. at 318, 101 S.Ct. at 1130–31. Plaintiffs seek state contract and tort law remedies arising out of contracts which were previously approved by the ICC and the STB pursuant to federal law.

[¶ 18] Complete preemption occurs whenever state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Kalo Brick,* 450 U.S. at 317, 101 S.Ct. at 1130 (quoting *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971)). In deciding whether a federal law preempts a state statute, our task is "to ascertain Congress' intent in enacting the federal statute at issue." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 738, 105 S.Ct. 2380, 2388, 85 L.Ed.2d 728 (1985).

[¶ 19] Plaintiffs claim that the parties rights and obligations arise out of a 1975 trackage rights agreement, a 1977 trackage rights agreement, a 1986 supplemental agreement, and a 2001 donation agreement. The trackage rights agreements were executed and approved by the ICC pursuant to the former 49 U.S.C. § 11343(a)(6) which provided, in part, that certain transactions "may be carried out only with the approval and authorization of the Commission" including "acquisition by a rail carrier of trackage rights over, or joint ownership on or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier."

[¶ 20] The United States Supreme Court has held "that suits to enforce contracts contemplated by federal statutes may set forth federal claims and that private parties in appropriate cases may sue in federal court to enforce contractual rights created by federal statutes". *Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union,* 457 U.S. 15, 22, 102 S.Ct. 2202, 2207, 72 L.Ed.2d 639 (1982). The critical factor is Congressional intent behind the statute which authorizes the contract. If Congress intended that the contracts be "creations of federal law and that the rights and duties contained in those contracts be federal in nature, then the [plaintiffs'] suit states federal claims. Otherwise, the [plaintiffs'] complaint presents only state-law claims." *Id.* at 22–23, 102 S.Ct. at 2207 (internal citations omitted).

[¶ 21] The 1877 Act to Regulate Commerce created the Interstate Commerce Commission to protect shippers from the monopoly power of the railroad industry by regulating railway rates and prohibiting rate discrimination, price fixing, and rebating. S.Rep. 104–176. Subsequently, the ICC's regulatory authority was expanded to include pipeline transportation, motor carriers, inland coastal water carriers, and telegraph, telephone, cable and radio communications. *Id.* In 1967, the DOT was created, in part, to take over the ICC's safety functions with economic regulation remaining with the ICC. *Id.* In spite of the ICC's broad regulatory powers, the railroad industry was plagued with bankruptcies. The Railroad Revitalization and Regulatory (4–R) Act of 1976 and the Staggers Rail Act of 1980 reformed the railroad industry by reducing rail rate regulation and giving the industry market freedom. *Id.* Other carrier industries

were also deregulated, resulting in the decline of ICC responsibilities. *Id.* The ICC Termination Act of 1995 ("ICCTA") abolished the ICC, PL 104–88, § 101, and established the Intermodal Surface Transportation Board ("STB"), PL 104–88, § 201. Obsolete or unnecessary ICC regulatory functions were repealed and residual functions were transferred to the newly established STB or the Secretary of Transportation. S. Rep. 104–176. The railway provisions are now codified at 49 U.S.C. §§ 10101–11907.

[¶ 22] The ICCTA was designed to "preserve the careful balance put in place by the 4R Act and the Staggers Act that led to a dramatic revitalization of the rail industry while protecting significant shipper and national interests." S. Rep. 104–176. The ICCTA sets forth that one of the policies of the United States Government in regulating the railroad industry is "to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. § 10101(2). The drafters were careful to state that:

> Nothing in this bill should be construed to authorize States to regulate railroads in areas where Federal regulation has been repealed by this bill. Further, the Committee intends that those States regulating intrastate rail transportation continue to be required to regulate only in a manner consistent with the ICA. The railroad carriers that comprise the railroad industry rely on a nationally uniform system of economic regulation. Subjecting rail carriers to regulatory requirements that vary among the States would greatly undermine the industry's ability to provide the "seamless" service that is essential to its shippers and would waken (sic) the industry's efficiency and competitive viability.

S. Rep. 104–176.

[¶ 23] The ICCTA retained "Federal regulatory oversight of line construction, line abandonments, line sales, leases, and trackage rights, mergers and other consolidations ... car supply interchange, antitrust immunity for certain collective activities ... competitive access, financial assistance, feeder line development, emergency service orders, and recordation of equipment liens." S. Rep. 104–176. Accordingly, the ICCTA includes a provision that the jurisdiction of the Surface Transportation Board over

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). Section 10501(b) makes it "manifestly clear that Congress intended to preempt ... state statutes, and any claims arising therefrom, to the extent that they intrude upon the STB's exclusive jurisdiction over 'transportation by rail carriers' and 'the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.'" *Railroad Ventures, Inc. v. Surface Transp. Board,* 299 F.3d 523, 563 (6th Cir.2002). According to this case, the preemptive effect of section 10501(b) is only to the extent that a

state statute conflicts with federal law. *Id.*

[¶ 24] One circuit has held that there exists a "presumption against preemption" which dictates that if section 10501(b) "can be read sensibly not to have a pre-emptive effect, the presumption controls and no pre-emption (sic) may be inferred." *Florida East Coast Railway Co. v. City of West Palm Beach,* 266 F.3d 1324, 1328 (11th Cir.2001). The Eleventh Circuit in this case concluded that local zoning ordinances which do not constitute "regulation of rail transportation" are not preempted by section 10501(b). *Id.*

> Rather, express pre-emption (sic) applies only to state laws "with respect to *regulation* of rail transportation." 49 U.S.C. § 10501(b) (emphasis added). This necessarily means something qualitatively different from laws "with respect to rail transportation." ... In this manner, Congress narrowly tailored the ICCTA pre-emption (sic) provision to displace only "regulation," i.e., those state laws that may reasonably be said to have the effect of "managing" or "governing" rail transportation, Black's Law Dictionary 1286 (6th ed.1990), while permitting the continued application of laws having a more remote or incidental effect on rail transportation.

*Id.* at 1331.

[¶ 25] The Fifth Circuit has held that section 10501(b) preempts the Texas Anti-Blocking Statute and common law claims of negligence based upon the amount of time a train occupies a rail crossing because "[r]egulating the time a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates its trains, with concomitant economic ramifications." *Friberg v. Kansas City Southern Railway,* 267 F.3d 439, 443–44 (5th Cir.2001).

[¶ 26] The foregoing cited cases dwell upon the issue of which law to apply, rather than the choice of forum available. State contract claims and tort claims which arise out of interference with voluntarily assumed contractual obligations are not necessarily analogous to regulatory statutes clearly preempted by section 10501(b). One of the questions presented by the motion to remand is whether some or all of those state claims are in essence federal claims which can only be asserted in a federal forum, justifying removal under 28 U.S.C. § 1441.

[¶ 27] The First Circuit has held that, based upon an analysis of the legislative history of the ICCTA, section 10501(b) does not divest the district courts of jurisdiction in favor of STB jurisdiction. *Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co.,* 215 F.3d 195, 204 (1st Cir.2000). Likewise, the parties in this case agree that jurisdiction over their disputes does not rest in the STB. Indeed, there is no statutory or regulatory mechanism to resolve the present disputes and the STB has apparently consistently taken the position that it does not pass on purely contractual disputes.

[¶ 28] The ICCTA is a comprehensive regulatory scheme designed to deregulate the railroad industry and remove all state efforts to regulate railroads. *Dakota, Minnesota & Eastern Railroad Corp. v. South Dakota,* 236 F.Supp.2d 989 (D.S.D.2002). The DM & E took that very position in its lawsuit before Chief Judge Piersol. Perhaps that explains in part why the DM & E is here an involuntary plaintiff. The ICCTA's preemption provision is broad in scope in that it preempts all state efforts to regulate railroads. *Id.* at 1005 (holding that South Dakota's eminent domain statutes are preempted, but only to the extent of the regulatory nature of their effect on the railroad). The foregoing case held that, although the area of railroad regulation is off limits to the state,

where the ICCTA does not authorize eminent domain to carry out the operations authorized by the STB, state law eminent domain regulations are not necessarily preempted. *Id.* at 1009. The corollary could be that, since the ICCTA authorizes the STB to regulate the contracts at issue in this case but does not set forth any criteria for their enforcement, state contract enforcement claims are not preempted. The present action, however, is much more than an action to enforce or interpret a contract.

[¶ 29] The ICCTA gives the STB jurisdiction to approve contracts and rates. *See* PL 104–88 § 107, 49 U.S.C. §§ 10701–10709. The ICCTA specifically authorizes contracts between carriers and purchasers of rail services but states that such authorization "does not confer original jurisdiction on the district courts of the United States based on section 1331 or 1337 of Title 28, United States Code." 49 U.S.C. § 10709(c). There is no similar statutory language concerning contracts between and among carriers. Congress' failure to except carrier trackage and switching contracts from federal jurisdiction may well evidence a Congressional intent that these contracts are within the district courts' original jurisdiction.

[¶ 30] "Complete preemption occurs only when a plaintiff's claim itself is based on rights created directly by, or substantially dependent on an analysis of"

federal law. *Johnson v. AGCO Corp.*, 159 F.3d 1114, 1116 (8th Cir.1998). The contracts at issue here arise out of federal law. Further, the interpretation of these contracts and any determination of damages will be dependent, in large part, upon an analysis of the purposes of the federal rail policy.

[¶ 31] The House version of the ICCTA included a provision at section 10103 that provided: "Except as otherwise provided in this part, the remedies provided under this part are exclusive and preempt the remedies provided under Federal or State law." H. Rep. 104–311, 1995 U.S.C.C.A.N. 793.[1] The Committee Report stated that "this provision is conformed to the bill's direct and general pre-emption (sic) of State jurisdiction over economic regulation of railroads. As used in this section, 'State or Federal law' is intended to encompass all statutory, common law, and administrative remedies addressing the rail-related subject matter jurisdiction of the Transportation Adjudication Panel." H. Rep. 104–311, 1995 U.S.C.C.A.N. 807.

[¶ 32] The House version of what eventually became 49 U.S.C. § 10501(b) provided:

(b) The jurisdiction of the Panel over—
    (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, inter-

---

1. The Staggers Rail Act of 1980 amended that provision:

    to make explicit that where the Interstate Commerce Act provides an exclusive remedy, such remedy is not in addition to remedies under another law or at common law... The Conferees' intent is to ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by State regulation of rates, practices, etc., which are not in accordance with these goals. Accordingly, the *Act preempts State authority* over rail rates, classification, rules and practices. *States may only regulate in these areas if they are certified* under the procedures of this section. The remedies available against rail carriers with respect to rail rates, classifications, rules and practices are exclusively those provided by the Interstate Commerce Act, as amended, and any other federal statutes which are not inconsistent with the Interstate Commerce Act. *No State law or federal or State common law remedies are available.*

    H.R. Conf. Rep. 96–1430, 1980 U.S.C.C.A.N. 4110, 4138 (emphasis supplied).

change, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive.

H. Rep. 104–311, § 10301, 1995 U.S.C.C.A.N. 793. The Committee Report stated that this section was intended

"to reflect the direct and complete preemption (sic) of State economic regulation of railroads. The changes include extending exclusive Federal jurisdiction to matters relating to spur, industrial, team, switching or side tracks formerly reserved for State jurisdiction under former section 10709. The former disclaimer regarding residual State police powers is eliminated as unnecessary, in view of the *Federal policy of occupying the entire field of economic regulation of the interstate rail transportation system*".

H. Rep. 104–311, 1995 U.S.C.C.A.N. 807–08 (emphasis supplied).

[¶ 33] Senator Ashcroft, in speaking to the Commerce, Science, and Transportation Committee about Senate bill 1396, the Senate's version of the ICCTA, stated:

One issue which I feel needs to be examined further is that of remedies. Specifically, Congress must determine whether or not the Federal law for remedies should be exclusive and preempt remedies based on statutory or common law. The prevailing case law, as developed by courts across the country, has long interpreted the Interstate Commerce Act to prohibit remedies based on statutory or common law. However, recent court decisions have allowed action (sic) against carriers to proceed under other laws. I believe that Congress

should be concerned about these decisions because they have the potential of undermining uniform federal policy. In fact, the Department of Transportation's "Report on the Future of the Interstate Commerce Commission" published in July of 1995 stated specifically that "repeals or cutbacks in ICC's current regulatory authority should not revive common law or state jurisdiction."

Exclusive preemption of other remedies would prevent a confusing situation where legal actions are instituted under a variety of laws. This could result in similar claims being treated differently from one state to another and would likely encourage forum shopping. In order to avoid this, exclusive remedies are needed to provide a consistent method of resolving disputes and prevent needless litigation.

I believe the Committee should continue to examine this issue before S. 1396 is brought to the floor of the Senate. I believe it has been and continues to be, the intent of Congress to establish a uniform federal standard for the benefit of interstate commerce and this nation's economy.

S. Rep. 104–176.

[¶ 34] The Conference Committee moved the preemption language in section 10103 to the section dealing with jurisdiction and the result was codified at 49 U.S.C. § 10501. H.R. Conf. Rep. 104–422, 1995 U.S.C.C.A.N. 850. The Conference Committee clarified that

the exclusivity is limited to remedies with respect to rail regulation—not State and Federal law generally. For example, criminal statutes governing antitrust matters not pre-empted (sic) by the Act, and laws defining such criminal offenses as bribery and extortion, remain fully applicable unless specifically displaced, because they do not generally

collide with the scheme of economic regulation (and deregulation) of rail transportation.

H.R. Conf. Rep. 104–422, 1995 U.S.C.C.A.N. 852.

[¶ 35] I find that it is of some significance that the portion of the ICCTA dealing with motor carriers includes a provision that "the remedies provided under this part are in addition to remedies existing under another law or common law." 49 U.S.C. § 13103. The motor carrier provisions contain no preemption provision analogous to section 10501. Likewise, the ICCTA provisions dealing with pipeline carriers contain no preemption provision. *See* 49 U.S.C. § 15301 et seq.

[¶ 36] Deregulation of the airline industry began in 1978 with the Airline Deregulation Act of 1978, P.L. 95–504. That Act added a preemption provision applicable to air carrier transportation similar to the provision concerning railroads. P.L. 95–504, § 4(a). That provision, now codified at 49 U.S.C. § 4173(b), provides that a State "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."

[¶ 37] The United States Supreme Court has held that the broad preemptive reach of the airline act does not preempt "state-law-based court adjudication of routine breach-of-contract claims." *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 232, 115 S.Ct. 817, 826, 130 L.Ed.2d 715 (1995).

[¶ 38] The present case, however, is not a "routine breach-of-contract" case. It is much more than that. The complaint seeks also a tort recovery and punitive damages. Any extremely high award for punitive damages could well seriously impact the ability of BNSF to serve the shipping public in South Dakota and elsewhere. Economic recoveries sought could well impact rates, routes, and services.

[¶ 39] To allow South Dakota to seek and recover punitive damages in a state court is to allow almost unlimited state "regulation." One needs to only look at the history of states and tobacco companies to see what is possible. The power to punish with huge monetary penalties is the most stringent "regulation" possible. Frankly speaking, the SDRA has "gone too far" in this case in seeking to have common law and South Dakota statutory remedies applied to significantly punish BNSF. Congress did not intend to permit a state or private party to do this in a manner to trump federal law and policy. Likewise, the agreement between BNSF and the SDRA would not have been approved had the federal agency anticipated the several claims now being advanced by the SDRA.

> The ADA's preemption clause, § [41713(b)(1)], read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

*American Airlines, Inc. v. Wolens,* 513 U.S. at 232–33, 115 S.Ct. at 826. Thus, a class action for breach of contract arising out of the airline's retroactive modification of the frequent flyer program was allowed to proceed in state court. As explained earlier, however, the present action by the SDRA and the DMV & W is far more than a breach of contract or declaratory judgment action. I again note that the presence of even one preempted federal claim gives the defendant the right to remove

the entire case to federal court. 28 U.S.C. § 1441(c).

[¶ 40] I find therefore that there is an express preemption as to claims brought by South Dakota for punitive damages and tortious interference which preemption results from the action of Congress. I find also that, if there is no express preemption, there is an implied preemption resulting from an inference that Congress intended to oust state common law and statutory remedies for punitive damages and tort recoveries of the nature sought here against BNSF by South Dakota. I also find that the Supremacy Clause would not permit what the SDRA seeks to do here in state court. Finally, as will later appear, regardless of whether any preemption exists, diversity of citizenship will exist, thus permitting this action to go forward in federal court.

## II. ELEVENTH AMENDMENT IMMUNITY.

■■■ [¶ 41] The SDRA contends that the Eleventh Amendment to the United Sates Constitution requires remand of this case. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." It is well settled that the Eleventh Amendment applies only to suits "commenced or prosecuted against" the State and does not bar removal where the State is a plaintiff. *See California ex rel. Lockyer v. Mirant Corp.*, 2002 WL 1897669 (N.D.Cal.2002) (unpublished) (citing *Illinois v. Milwaukee*, 406 U.S. 91, 101, 92 S.Ct. 1385, 31 L.Ed.2d 712, (1972)); *In re Rezulin Products Liability Litigation*, 133 F.Supp.2d 272, 297 (S.D.N.Y.2001); *Regents of University of Minnesota v. Glaxo Wellcome, Inc.*, 58 F.Supp.2d 1036, 1039 (D.Minn.1999); *State of Vt. v. Oncor Communications, Inc.*, 166

F.R.D. 313, 321 (D.Vt.1996); *Banco y Agencia de Financiamiento de la Vivienda de Puerto Rico v. Urbanizadora Villalba*, 681 F.Supp. 981, 982–83 (D.Puerto Rico 1988); and *South Dakota State Cement Plant Com'n for Use and Benefit of State of S.D. v. Wausau Underwriters Ins. Co.*, 778 F.Supp. 1515, 1522 (D.S.D.1991). The SDRA's Eleventh Amendment claim is rejected.

## III. INVOLUNTARY PLAINTIFF

■■■ [¶ 42] The DM & E was added as an involuntary plaintiff pursuant to SDCL 15–6–19(a). Fed.R.Civ.P. 19(a)(2)(ii), the analogous federal rule with regard to involuntary parties, provides that "[i]f the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff." The label involuntary plaintiff "is reserved for parties who are forced to join a suit as indispensable parties despite the fact that they are not subject to service of process and thus cannot be included as defendants." *Commercial Union Ins. Co. v. Cannelton Industries, Inc.*, 154 F.R.D. 164, 168 (W.D.Mich. 1994).

Because such joinder is disfavored, the "proper case" requirement has been interpreted to mean that a party may only be joined as an involuntary plaintiff if that party "(1) has an obligation to permit its name or title to be used to protect rights asserted in the action; (2) is beyond the jurisdiction of the court; and (3) has refused to voluntarily join in the action following notification thereof." *Sheldon v. West Bend Equipment Corp.*, 718 F.2d 603, 606 (3rd Cir.1983) (*citing Independent Wireless Telegraph Co. v. Radio Corporation of America*, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357 (1926) for support).

*Hicks v. Intercontinental Acceptance Corp.*, 154 F.R.D. 134, 135 (E.D.N.C.1994).

Rule 19(a), which authorizes joinder of unwilling plaintiffs, "makes no provision for a plaintiff to require another person to maintain an action vested solely in such other person, even though its maintenance might result in benefit to the plaintiff." *Coast v. Hunt Oil Co.*, 195 F.2d 870, 872 (5th Cir.), *cert. denied*, 344 U.S. 836, 73 S.Ct. 46, 97 L.Ed. 651 (1952). *See also Rhode Island Comm. on Energy v. General Servs. Admin.*, 561 F.2d 397, 402–03 (1st Cir.1977); *In re Interstate Motor Freight System IMFS, Inc.*, 71 B.R. 741, 746 (Bankr. W.D.Mich.1987). A narrow exception to this general rule originated with *Independent Wireless Tel. Co. v. Radio Corp. of Amer.*, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357 (1926), a case in which the holder of an exclusive patent license sought to sue for infringement of the patent. The exception is that an involuntary plaintiff may be joined to cure the original plaintiff's inability to press a claim if the original plaintiff and the involuntary plaintiff have "such a relationship that the absent party must allow the use of his name as plaintiff." 3A James W. Moore et al., Moore's Federal Practice ¶ 19.06 at 84 (2d ed.1995).

*Diagnostic Unit Inmate Council v. Films Inc.*, 88 F.3d 651, 654 (8th Cir.1996).

[¶ 43] Like the facts in the foregoing case, the SDRA and the DM & E have no such relationship. The DM & E has no obligation, contractual or otherwise, to allow the SDRA to use its name to secure relief that only the DM & E may seek. Further, there is no evidence that the DM & E is not subject to service of process. Joinder of the DM & E was clearly improper, especially after having been accomplished by an amended complaint rather than a court order.

[¶ 44] Rule 19 provides that joinder of an involuntary party is proper only if "joinder will not deprive the court of jurisdiction over the subject matter of the action." South Dakota's version of Rule 19 does not include the quoted language.

The phrase "deprive the court of jurisdiction over the subject matter of the action" has been most commonly interpreted to mean joinder which destroys diversity. Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, 7 Federal Practice and Procedure § 1610 (1986).

*Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 505 n. 9 (8th Cir.1995).

[¶ 45] As previously discussed, Fed. R.Civ.P. 21 provides that: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." It is "just" to drop the DM & E as an involuntary party plaintiff but only on the condition that the counterclaims of BNSF against the DM & E are also dismissed. "Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time" in order to cure jurisdictional defects where dismissal of the nondiverse party will not prejudice any of the parties in the litigation. *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832–838, 109 S.Ct. 2218, 2222–2226, 104 L.Ed.2d 893 (1989). The DM & E is a dispensable party. The core contractual rights at issue here are those between the SDRA and the BNSF. The DM & E and the DMV & W can only claim an interest in this litigation as a "designee" or "tenant" of the SDRA. It is true that the DM & E and the DMV & W have separate rights and obligations arising out of their separate agreements with each other and with shippers. BNSF is not involved in those matters. The DM & E will not be prejudiced by dismissal and should be dropped as an

involuntary plaintiff. I find that the joinder of the DM & E was "fraudulent." As previously discussed, the use of this term does not imply any "bad motive" on the part of the SDRA. The term is not used in the "tort" sense or with any indication of any intent on the part of the SDRA to deceive. It is nothing but a term of art and is not intended to impugn the integrity of the SDRA or its attorneys. There is no requirement of any showing that the involuntary joinder was for the purpose of preventing removal. The joinder, however, simply "clutters up" this action. The parties and the court should proceed to determine what the obligations are of the two parties to the contract. The DM & E has no possible cause of action against BNSF arising out of the agreement between the SDRA and BNSF. Any such claimed cause of action would be patently spurious.

[¶ 46] An analogy comes to mind. A citizen of one state wishes to be able to purchase Buick automobiles from a particular franchised dealer. A dispute exists between Buick and the dealer. Buick seeks to cancel the franchise. Could or should the disgruntled customer be involved in the litigation between the parties to the franchise agreement and defeat diversity? The answer is obvious.

[¶ 47] It has often been said that a federal court has an unfailing obligation to exercise jurisdiction in an appropriate case. This is such a case. Accordingly,

[¶ 48] IT IS ORDERED:

1. The motions to remand, Docs. 3 and 7, are denied.

2. The DM & E is dropped as an involuntary plaintiff and the counterclaims of BNSF against the DM & E are dismissed without prejudice and without the taxation of costs.

3. The caption shall be amended accordingly.